FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ DEC 31 2009
P.M. _____
TIME A.M. _____

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
ELIZABETH ABDUS-SABUR,

                Plaintiff,

  — against —

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
------------------------------------------------------------X

**MEMORANDUM AND ORDER**

06-CV-4934 (SLT)

**TOWNES, United States District Judge:**

    Elizabeth Abdus-Sabur ("Plaintiff"), proceeding *pro se*, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) to seek reversal of a final decision of the Commissioner of Social Security that she was not eligible for disability insurance benefits under the Social Security Act ("the Act"). Plaintiff asserts that she is disabled because of a non-cancerous pituitary tumor, headaches, and blurred vision. The Commissioner found that Plaintiff maintained a residual functional capacity to sit, stand, and walk without limitation but not perform work that requires acute vision. The Commissioner determined that her medical conditions did not prevent Plaintiff from performing her past relevant work. Based on these reasons, the Commissioner denied her claims for disability benefits. The Commissioner has filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, seeking dismissal of Plaintiff's complaint.

    For the following reasons, the Court remands this case to the Commissioner for an adequate determination of whether Plaintiff may perform her past relevant work.

## BACKGROUND

**I.    Factual History**

1

Plaintiff was a born on May 12, 1957 and was 48 years old at the time the Commissioner's decision was rendered. Admin. R. ("A.R.") at 15, 34. She graduated high school and completed two years of college. *Id.* at 54. Her past work experience includes employment as a toll collector and a home attendant. *Id.* at 15. She maintains that she became disabled on June 1, 2003 due to a non-cancerous pituitary tumor with headaches and blurred vision. *Id.* at 16, 34.

On August 7, 2003, Plaintiff complained of blurry vision and double vision during a visit to the Kings County Hospital Center ("KCHC") walk-in clinic. *Id.* at 96. She reported a history of a pituitary tumor, but indicated she did not feel any pain. *Id.* An assessment at the clinic showed that she had 20/20 corrected vision in her right eye and 20/400 corrected vision in her left eye. *Id.* at 97. She was referred to an eye clinic. *Id.*

On December 10, 2003, Plaintiff visited the KCHC Endocrine Clinic for her chromophobe adenoma pituitary. *Id.* at 78. The records indicated that she had previously refused surgery for the condition. *Id.* They also show that she was prescribed the medication, parlodel, but she was non-compliant with her treatment plan. *Id.* She was instructed to restart her medications. *Id.*

On January 29, 2004, Plaintiff was examined by a consultative ophthalmologist, Dr. Rory Dolan. *Id.* at 113. Dr. Dolan noted that Plaintiff was diagnosed with a pituitary tumor approximately fourteen years earlier. *Id.* She told Dr. Dolan that she refused surgery for the tumor because she was scared. *Id.* She indicated that she started to lose vision on the sides of both eyes three years prior and that surgery was again recommended. *Id.* She stated that she again refused surgery at the time. *Id.* Dr. Dolan then conducted numerous tests on Plaintiff's eyes. He found Plaintiff to have a visual acuity of 20/20 in her right eye and 20/70 in her left

eye. *Id.* at 114. She had full motility and an examination of her lids was normal. *Id.* No double vision was elicited during the examination and her eyes were straight. *Id.* The anterior segments, irises, and papillary response were within normal limits. *Id.* Plaintiff's right eye had some peripheral cortical spoking which was off the visual axis and the lens of her left eye was totally clear. *Id.* There was significant atrophy, with the left eye more advanced than the right eye. *Id.* He also found significant amount of cupping in the left eye (80%) and right eye (50%). *Id.* Dr. Dolan's final diagnosis was that Plaintiff suffered "significant visual field loss consistent with a chiasmal." *Id.* Dr. Dolan advised Plaintiff of her severe visual field defect, but noted that she was still afraid to have surgery. *Id.* Dr. Dolan concluded that the visual field loss is most likely permanent and secondary to a pituitary lesion. *Id.*

On January 29, 2004, Plaintiff was examined by consultative internist Dr. Antonio De Leon. *Id.* at 117. Plaintiff reported to Dr. De Leon that she was diagnosed with non-cancerous pituitary tumor in 1990 and she was prescribed with bromocriptine. *Id.* She indicated that her tumor did not grow, but she was not sure if it shrunk. *Id.* She claimed to develop blurring of vision with loss of peripheral vision. *Id.* Dr. De Leon conducted a full physical examination of Plaintiff and determined that she was "[f]airly developed" and "fairly nourished" with a "fair" prognosis. *Id.* at 117, 118. Dr. De Leon observed that Plaintiff's station and gait were "normal." *Id.* at 117. She had "no difficulty transferring from a seated position on and off the exam table" and she had full use of both hands and arms in dressing and undressing. *Id.* Dr. De Leon described her finger and hand dexterity and cerebellar functions as "intact." *Id.* at 118. Her spine joints had a "full range of motion without deformities, swelling warmth or tenderness." *Id.* She could "tandem walk" and walk on the ball or heel of her feet. *Id.* She had no muscle atrophy, spasms, or instability. *Id.* She was alert and oriented "x 3." *Id.* Her motor, sensory

3

and deep tendon reflexes were all "normal." *Id.* He concluded, "[i]n my opinion [Plaintiff] is able to perform the following work related activities[:] sitting, no limitation. Walking, standing, no medical limitations. Carrying and lifting, no medical limitations. Advised to continue treatment with treating physician." *Id.*

On April 7, 2004, Plaintiff again visited the KCHC Endocrine Clinic and was seen by Dr. Jean Leonidas. *Id.* at 132. Dr. Leonidas found Plaintiff under no acute distress, alert and oriented in all spheres with a "normal" heart. *Id.* Dr. Leonidas noted that Plaintiff had a pituitary macro-adenoa and that she refused surgery and had not been taking her medications. *Id.* The notes indicate that Plaintiff visited with a religious counselor who advised her that she should follow the doctor's order to take her bromocriptine. *Id.* Dr. Leonidas's treatment plan included re-ordering her prescriptions. *Id.*

On June 23, 2004, Plaintiff was admitted to KCHC by Dr. Tonia L. Parkinson for complaints of tunnel vision, headaches, and lightheadedness, as well as dizziness for the past three weeks to two months. *Id.* at 134, 138, 142. At the time, Plaintiff was "alert," "oriented," and under "no acute distress." *Id.* at 138. She was able to "move[] all extremities," "respond[] appropriately," and her pupils were equal, round, reactive to light. *Id.* She had 20/30 vision in her right eye and 20/100 in her left eye. *Id.* at 134. Records characterized her headaches as "mild" to "moderate." *Id.* at 140. She was prescribed Tylenol and decadron and advised to take the pain medications as prescribed. *Id.* at 135, 148. Her discharge plan stated that she could engage in activity "as tolerated." *Id.* at 135, 136.

On June 23, 2004, she also was seen at the ophthalmology clinic and assessed with optic atrophy, bitemporal hemianopsia and pituitary macradenoma. *Id.* at 149. Her visual acuity was 20/25 in her right eye and 20/150 in her left eye. *Id.* An endocrine consultant examined her on

the same day and the consulting physician's notes repeats her history of being advised of and refusing surgery for her pituitary tumor. *Id.* at 150. It noted that she was non-compliant with her medication treatment program, but she was taking her medications for the past two months. *Id.* The consulting physician advised her that she had already lost a significant degree of vision on both sides based on her visual field examination and her continued refusal to have surgery could to lead to visual or life threatening complications. *Id.*

## II.     Procedural History

On December 1, 2003, Plaintiff applied for disability insurance benefits. Her application was initially denied and a request for a hearing was timely filed by Plaintiff. Plaintiff appeared and testified at a hearing before administrative law judge Joseph K. Rowe ("ALJ") on July 28, 2005. She was represented by counsel during the hearing. On October 28, 2005, the ALJ issued a written opinion denying Plaintiff's application for disability benefits, holding that she was not under a disability for purposes of the Act. *Id.* at 12-19. The ALJ's decision became the final decision of the Commission when the Appeals Council denied Plaintiff's request for a review on February 1, 2006. *Id.* at 5-7. She commenced the instant action on September 9, 2006.

## DISCUSSION

### A.     Standard of Review

This Court may set aside an ALJ's decision only where it is based upon legal error or where its factual findings are not supported by substantial evidence. *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "To determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Snell v. Apfel*, 177 F.3d 128, 132 (2d Cir. 1999) (internal quotation marks omitted). "Substantial evidence is 'more

than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

This Court also reviews the ALJ's decision to determine whether the ALJ applied the correct legal standard. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). "'Where an error of law has been made that might have affected the disposition of the case, this Court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ.'" *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (quoting *Wiggins v. Schweiker*, 679 F.2d 1387, 1389 n.3 (11th Cir. 1982)). This Court reviews questions of law *de novo*. *Id.*

## B. Legal Standard for Disability Determinations

In order to establish entitlement to benefits under the Act, a claimant must establish that she has a "disability." *See Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). The term "disability" is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Balsamo*, 142 F.3d at 79.

In evaluating a claim for disability benefits, the ALJ must follow the five-step procedure set out in the regulations governing the administration of Social Security benefits. *See* 20 C.F.R. §§ 404.1520, 416.920; *Diaz v. Shalala*, 59 F.3d 307, 312 n.2 (2d Cir. 1995); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such

an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry, 675 F.2d at 467) (alterations and omission in original). The claimant bears the burden of proof in the first four steps of the inquiry, but the Commissioner bears the burden in the fifth step. Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004) (quoting Balsamo, 142 F.3d at 80).

## C. Application

In this case, the ALJ denied Plaintiff disability benefits based on his findings that, although her non-cancerous pituitary tumor with headaches and blurred vision was "severe," it was "not severe enough" to meet or medically-equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (hereinafter a "Listed impairment"). A.R. at 18. Since the ALJ did not find that Plaintiff suffered from a Listed impairment, she was not considered presumptively disabled under step three of the disability framework. See Ferraris v. Heckler, 728 F.2d 582, 584 (2d Cir. 1984). Additionally, the ALJ found Plaintiff maintained a residual functional capacity for sitting, standing, and walking without limitation but she cannot perform work that requires acute vision. A.R. at 19. Based on this residual functional capacity, the ALJ held that Plaintiff could do her past relevant work as a toll collector under step four. For these reasons, the ALJ concluded that she was not under a "disability" as defined in the Act. Id. at 19.

### a. Listed Impairment

Plaintiff argues that the ALJ did not fully consider whether Plaintiff's visual disability or pituitary tumor constitute a Listed impairment. Plaintiff also maintains that the ALJ did not properly review the medical evidence, such as her field of vision test, in denying that she had a Listed visual disorder.

At the time of the ALJ's decision, the Commissioner's regulations, entitled "Disorders of Vision," provided for three presumed-disabling impairments: impairment of visual acuity (Listing 2.02), contraction of peripheral visual fields in the better eye (Listing 2.03), and loss of visual efficiency (Listing 2.04).[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, 2.00-2.04 (2005) (hereinafter, "Listing"). The regulations describe that the "[l]oss of visual efficiency may be caused by disease or injury resulting in reduction of visual acuity or visual field." Listing 2.00A.5. The loss of visual acuity results in inability to distinguish detail and prevents reading and fine work, while the loss of the peripheral field restricts the ability of an individual to move about freely. Listing 2.00A.1. The regulations define the three conditions as:

> 2.02 Impairment of Visual Acuity. Remaining vision in the better eye after best correction is 20/200 or less.
>
> 2.03 Contraction of peripheral visual fields in the better eye, with:
>
> > A. To 10° or less to the point of fixation; or
> > B. So the widest diameter subtends an angle no greater than 20°; or
> > C. To 20 percent or less visual field efficiency.
>
> 2.04 Loss of visual efficiency. The visual efficiency of the better eye after best correction is 20 percent or less.

Listing 2.02-2.04.

---

[1] Effective February 20, 2007, the listings for visual disorders were revised. *See* Revised Medical Criteria for Evaluating Visual Disorders, 71 Fed. Reg. 67037 (Nov. 20, 2006). The Court applies the regulations in effect at the time of the Commissioner's decision. In any event, the revisions involved here do not alter the Court's analysis of the case.

Nothing in the record indicates that Plaintiff's has a presumed-disabled impairment. First, Plaintiff does not meet the severity for blindness under Listing 2.02, which requires a visual acuity of 20/200 or less in the claimant's better eye. Dr. De Leon concluded that Plaintiff had a visual acuity of 20/25 in her right eye and 20/70 uncorrected in her left eye in a test administered on January 29, 2004. A.R. 117. Similarly, Dr. Dolan reported an uncorrected visual acuity of 20/20 in her right eye and 20/70 in her left eye in a January 28, 2004 examination. *Id.* at 114. Drs. De Leon and Dolan's, both consultative physicians, medical opinion is enough to support the ALJ's decision. *See Leach ex. Rel. Murray v. Barnhart*, No. 02-CV-3561, 2004 WL 99935, at *9 (S.D.N.Y. Jan.22, 2004) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole."). Their visual acuity results are consistent with the medical records indicating a visual acuity of 20/30 in her right eye and 20/100 to 20/150 in her left eye. *See id.* at 134, 149.

Second, Plaintiff's appears to have a 54% visual field efficiency in her better eye, well above the maximum threshold of 20% necessary for a peripheral visual field impairment under Listing 2.03(C). The percent of visual field efficiency is obtained by adding the number of degrees of the eight principal meridians of the contracted field in the visual field test and dividing that number by 500. Listing 2.00 Image 1.2. On January 28, 2004, Dr. Dolan observed principal meridians of 40, 50, 60, 60, 60, 0, 0, and 0 in Plaintiff's right eye. A.R. at 115. This equates to a 54% remaining visual field efficiency in her right eye (the sum of 40, 50, 60, 60, 60 divided by 500 = 54%) or a 46% loss.

Thirdly, Plaintiff's visual efficiency is 43.2%, which does not meet the presumed-disabled level of 20% or less under Listing 2.04. The percent of remaining visual efficiency is

equal to the product of the percent of remaining visual acuity efficiency and the percent of remaining visual field efficiency. Listing 2.04. Plaintiff's remaining visual acuity efficiency is 80% (20/25) in her right eye under Dr. De Leon's reading and, as stated above, she has a remaining visual field efficiency of 54% in her right eye, for a visual efficiency of 43.2%.

Finally, a pituitary lesion, in itself, does not qualify as a Listed impairment. The regulations consider "[d]ecreased visual fields attributable to a pituitary lesion" as condition necessary to establish "diabetes inspidus" as a Listed impairment. Listing 109.05. Nevertheless, the regulations do not permit the pituitary lesion and its accompanying visual field loss to constitute a presumed-disability impairment in itself. Accordingly substantial evidence supports the ALJ's finding that Plaintiff does not have a Listed impairment for purposes of establishing disability.

b. **Residual Functional Capacity**

Having found that Plaintiff did not have a Listed impairment for establishing a presumed disability, the ALJ next turned to step four which requires a determination of her residual functional capacity ("RFC"). RFC is defined as "what an individual can still do despite his or her limitations." *Terminello v. Astrue*, No. 05-CV-9491, 2009 WL 2365235, at *5 (S.D.N.Y. July 31, 2009) (citing Soc. Sec. Ruling ("SSR") No. 96-8p, 1996 WL 374184 (S.S.A. 1996)). Based on Plaintiff's testimony and the opinion of consultative physicians, the ALJ determined that Plaintiff "can perform sitting, standing and walking without limitation but she cannot perform work that requires acute vision." A.R. at 19. Substantial evidence supports this conclusion.

At her hearing before the ALJ, she testified that she could not work because of headaches and blurry and double vision related to her pituitary tumor. *Id.* at 176. She testified that a doctor had told her that glasses would not help her vision. *Id.* She claimed that "[s]ometimes" she was

in pain all day and stayed in bed because of the headaches. *Id.* at 181. She would get dizzy three or four times a month, or sometimes every other day. *Id.* at 186. She claimed to have headaches "constantly" and that she just rests or stays in bed to treat them. *Id.* at 187. She maintained that her doctor informed her that nothing could cure the headaches since they are a result of her pituitary tumor. *Id.* at 187. Plaintiff testified to having a five-day hospital stay in July of 2004 as a result of a blackout from dizziness and blurry vision. *Id.* at 178. The hospital prescribed medications for her, but the hospital records show that Plaintiff was noncompliant with the treatment. *Id.* at 132, 178. The records indicated that she refused surgery and she had not taken the medications. *Id.* at 132, 179. The records noted that Plaintiff had to go to a religious counselor who advised her to follow the doctor's order. *Id.* at 132. She testified that she did not comply with the treatment regimen because she did not have "medical coverage" to buy the medication. *Id.*

Plaintiff further complained of numbness on her side and tingling and numbness in her hands, but stated that she was not treated for either of these conditions. A.R. at 179-80, 185. She also claimed that she could stand for only fifteen to twenty minutes before her legs became weak. *Id.* at 183. Plaintiff also speculated that she could walk only three blocks before the onset of dizziness or double vision, although she rarely walks since she often takes taxis or gets a ride. *Id.* at 184, 186. Nevertheless, she reported that doctors examined her legs but did not prescribe any treatment for any aliments related to her legs. *Id.* 183, 184. She admitted that she could sit, bend, lift and carry "maybe" ten pounds without limitation. *Id.* at 184, 185.

Plaintiff testified that she does not cook, clean or shop. *Id.* at 182. Instead, a neighbor prepares her food and she pays her rent with help from people at her mosque. *Id.* At the beginning of the hearing, Plaintiff indicated that she arrived at the hearing by car alone, but later

stated that she did not drive or own a car. *Id.* at 171, 177. She maintains a driver license with no restrictions on it. *Id.* at 171. She is able to take public transportation, including subways and buses. *Id.* at 183.

While Plaintiff's subjective testimony is not wholly inconsistent with the ALJ's residual work function finding, the ALJ did not credit her testimony based on the fact that she was "at times, non-responsive, and was not generally credible." A.R. at 18. An ALJ is not obligated to accept a claimant's testimony about her complaints and restrictions without question and has the discretion to evaluate a claimant's credibility in light of the medical evidence in the record. *See Gallardo v. Apfel*, No. 96-CV-9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999) ("An administrative law judge may properly reject claims of severe, disabling pain after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility[.]").

First, Plaintiff's refusal to comply with her doctor's orders cuts against her credibility. Under SSA regulations, an "individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." SSR No. 96-7p, 1996 WL 374186, at *7 (S.S.A. 1996). Here, Plaintiff described debilitating headaches which required hospitalization. The records show that she was prescribed medications for her headaches. Yet at her hearing, she testified that she does not take any medication because her doctors told her that it would not help. Furthermore, she consistently complained of medical issues that she did not seek or receive treatment for.

Second, ample medical evidence contradicts Plaintiff's account of her conditions and supports the ALJ's conclusion regarding Plaintiff's residual work function. Primarily, Dr.

De Leon opined that Plaintiff is able to sit, walk, stand, carry, lift with no medical limitations. *Id.* at 118. Dr. De Leon observed that Plaintiff's station and gait were "normal." *Id.* at 117. She had "no difficulty transferring from a seated position on and off the exam table" and she had full use of both hands and arms in dressing and undressing. *Id.* Dr. De Leon described her finger and hand dexterity and cerebellar functions as "intact." *Id.* at 118. Her spine joints had a "full range of motion without deformities, swelling warmth or tenderness." *Id.* She could "tandem walk" and walk on the ball or heel of her feet. *Id.* She had no muscle atrophy, spasms, or instability. *Id.* She was alert and oriented "x 3." *Id.* Her motor, sensory and deep tendon reflexes were all "normal." *Id.* Furthermore, belying her testimony, Plaintiff told Dr. De Leon that she spends her day watching television and is able to walk ten blocks. *Id.* at 117. She was able to travel to the doctor's office using the bus. *Id.*

To be sure, Plaintiff suffered from "a significant visual field loss." *Id.* at 114. Dr. Dolan diagnosed her with a "severe visual field defect." *Id.* He found that the visual field loss is most likely permanent and secondary to her pituitary lesion. *Id.* Yet, although Plaintiff often complained of double vision, no double vision was elicited during Dr. Dolan's examination. *Id.* Furthermore, Dr. Dolan found Plaintiff's external examination of her eyes and lids "normal" and her motility "full." *Id.* Her eyes appeared to be straight for both near and distances. *Id.*

During an April 7, 2004 hospital visit, records indicate that Plaintiff was under no "acute distress," "alert, oriented x 3" and had a "normal' heart. *Id.* at 132. She experienced no pain. *Id.* Records from another visit on June 23, 2004 showed that Plaintiff complained of a headache, "dizziness," "throbbing" for three weeks to two months, which affected her sleep at night. *Id.* at 138. Nevertheless, the records concluded that Plaintiff was under "no acute distress," "alert," and "oriented." *Id.* The record indicated that she "moves all extremities," "responds

appropriately," and her pupils were equal, round, reactive to light. *Id.* The assessment characterized her headaches as only "mild" to "moderate." *Id.* at 140. Hospital notes and a KCHC Discharge Review Plan permit her to engage in physical activity "[a]s tolerated." *Id.* at 135-36.

Thus, the medical evidence does not support Plaintiff's testimony of incapacitating headaches, double vision or blurry vision. The ALJ's decision to find Plaintiff not credible in light of the medical evidence in the record and the contradictions in her own testimony was warranted.[2] Furthermore, substantial medical evidence strongly supports the ALJ's conclusion that, although she had significant peripheral vision loss, she could still sit, stand, and walk without limitations.

### c. Past Relevant Work

Based on Plaintiff's RFC, the ALJ then determined that Plaintiff's impairments did not preclude her from performing her past relevant work. "Past relevant work" is defined as work performed within the last fifteen years or fifteen years prior to the date that disability was

---

[2] In a letter to this Court dated September 2, 2008, Plaintiff submitted new medical evidence from her medical providers at KCHC. The additional evidence consists chiefly of treatment notes from doctors dated from December 22, 2006 until March 26, 2008. For example, two letters from Dr. Preeti Poley, dated March 20, 2007 and August 14, 2008, state that Plaintiff is "legally blind" due to severe vision field defects in both eyes.

The court may consider new evidence upon plaintiff showing that "the proffered evidence is (1) 'new' and not merely cumulative of what is already in the record, and that it is (2) material, that is, both relevant to the claimant's condition during the time period for which benefits were denied and probative, . . . and (3) [that there is] good cause for her failure to present the evidence earlier." *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1998) (citations omitted). "The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently." *Id.*

All the evidence submitted by Plaintiff here postdates the Commissioner's October 5, 2005 decision by several months. None of the new medical evidence purports to diagnose Plaintiff's medical condition for the period reviewed by the October 5, 2005 decision and therefore it is not material for a review of Commissioner's denial of her disability benefit at this time. Accordingly, the Court has not taken this new evidence under consideration in deciding this case.

established. *Hall v. Astrue*, No. 06-CV-1000, 2009 WL 2366891, at *8 (E.D.N.Y. July 31, 2009) (citing 20 C.F.R. § 404.1565). In determining past relevant work, the employment must have lasted long enough for the claimant to learn to do the job and have developed the skills to do such work. *Id.* In order to determine that Plaintiff can perform her past relevant work, the ALJ must find that Plaintiff retains the necessary RFC to perform the functional job demands of such work as she had previously performed them or as they are generally performed throughout the national economy. *Id.* (citing *Halloran v. Barnhart*, 362 F.2d 28, 33 (2d Cir. 2004)).

As stated above, the ALJ determined that Plaintiff's RFC allowed her to perform positions requiring sitting, walking or standing with no limitations but she cannot perform work that "requires acute vision." A.R. at 19. In other words, the ALJ's RFC indicates an exertional capability, *see* 20 C.F.R. § 404.1569a(b) (strength limitations such as sitting, standing, walking, lifting, carrying, pushing and pulling), for "light work," *see* 20 C.F.R. § 404.1567(b) (defining "light work" as carrying of objects weighing up to 10 pounds, requiring a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls). Her RFC also shows a "nonexertional impairment," *see* 20 C.F.R. § 404.1569a(c)(iv) (a non-strength limitation such as difficulty in seeing or hearing),[3] of severe peripheral vision loss.

Plaintiff previously worked as a home attendant from October 2002 to June 2003 and as a toll collector from June 1995 to October 2002. A.R. at 67, 69-70. For her toll collection position, Plaintiff indicated that would stand for three and half hours, sit for four hours, and walk

---

[3] Under step five, SSA regulations consider "using the eyes and ears to see and hear" a nonexertional activity. SSR 83-14, 1983 WL 31254, at *2 (S.S.A. 1983). The regulations hold that "[l]imitations of [this] function can affect the capacity to perform certain jobs at all levels of physical exertion and can "severely compromise[]" an entire range of jobs." *Id.* While these regulations pertain to step five, their rationale would apply with equal force to consideration of Plaintiff's ability to perform her past relevant work.

for one half hour. *Id.* at 69. She was required to lift and carry coins amounting to about ten pounds once a day. *Id.* Based on this, the ALJ concluded that Plaintiff's RFC was consistent with her duties as a toll collector since she was under no limitations for sitting, walking or standing and the toll collection position does not require a "broad field of vision." A.R. at 18.

The Court vacates and remands this finding. The ALJ has an affirmative duty to develop the record, even when a claimant is represented by counsel. *Samuels v. Barnhart*, No. 01-CV-3661, 2003 WL 21108321, at *8 (S.D.N.Y. May 14, 2003) (citing *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996)). Here, the ALJ has failed this duty. Nothing in the record supports the ALJ's conclusion that the position of toll collector does not require a "broad field of vision." The ALJ did not cite to any vocation expert testimony, regulations, or other evidence to reach his determination of the visual demands of toll collection. Plaintiff's description of her position does not illuminate whether or not peripheral vision is necessary for the position, *see* A.R. 69, and the ALJ elicited no relevant testimony from Plaintiff regarding her work as a toll collector, except for the dates of her employment, *id.* at 176.

The Commissioner now refers this Court to the U.S. Department of Labor's Dictionary of Occupational Titles ("DOT"),[4] even though it is not mentioned in the ALJ's decision. Even if the ALJ consulted the DOT, it would be unavailing. The DOT classifies toll collection as requiring "light work," see DOT, Code No. 211.462-038, available at http://www.occupationalinfo.org/21/211462038.htm, which is consistent with Plaintiff's exertional capabilities. Nevertheless, the DOT's characterization fails to account for Plaintiff's nonexertional impairment of severe peripheral vision loss. Contrary to the Commissioner's

---

[4] Under SSA regulations, the Commissioner may use the DOT "to obtain evidence . . . need[ed] to help . . . determine whether [the claimant] can do [her] past relevant work, given [her] residual functional capacity." 20 C.F.R. § 404.1560(b)(2).

position, the DOT is silent as to whether toll collection necessitates a broad field of vision, acute vision, or near or far visual acuity.

Accordingly, the Court is not satisfied that the ALJ's conclusion that Plaintiff may perform her past relevant work is supported by substantial evidence and vacates and remands this case solely on this question. On remand, the ALJ should develop the record regarding the visual demands of a toll collector, and compare those demands with Plaintiff's residual functional capacity, taking into consideration her non-exertional visual impairments.

## CONCLUSION

For the foregoing reasons, the Court remands this case to the Commissioner solely for a determination of whether Plaintiff may perform her past relevant work consistent with this Memorandum and Order.

**SO ORDERED.**

Dated: Brooklyn, New York
    December 23, 2009

/SANDRA L. TOWNES
United States District Judge